# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,

        Plaintiff,


v.                        **MEMORANDUM OF LAW & ORDER**
                            Criminal File No. 05-282 (MJD/JJG)


(1) CHRISTOPHER WILLIAM SMITH
a/k/a "Chris Jonson," a/k/a "Tony Spitalie,"
a/k/a "Bruce Jonson," a/k/a "Robert Jonson,"


(2) PHILIP MACH,


(3) BRUCE JORDAN LIEBERMAN,


(4) DANIEL SPIVEY ADKINS, and


(5) DARRELL ARDEN GRIEPP,
a/k/a "Darrell Green,"

        Defendants.

_____

Nicole A. Engisch and Elizabeth C. Peterson, Assistant United States Attorneys, Counsel for Plaintiff United States of America.

Joseph S. Friedberg, Lisa Lodin Peralta, and Casey Oppenheim, Joseph S. Friedberg, Chartered, Counsel for Defendant Christopher Smith.

Bruce G. Cassidy, Bruce G. Cassidy & Associates, PA, and Steven E. Wolter and Dan Scott, Kelley & Wolter, P.A., Counsel for Defendant Philip Mach.

Paul C. Engh, Engh Law Office, Counsel for Defendant Bruce Lieberman.

Earl P. Gray, Gray & Malacko, Counsel for Defendant Daniel Adkins.

Caroline Durham, Durham Law Office, Counsel for Defendant Darrell Griepp.
_____

## I.    INTRODUCTION

This matter is before the Court on pretrial motions by Defendants and the

Government.  A hearing on these motions was held on May 1, 2006.  During the

hearing, the Court ruled on all but the following motions, which the Court took

under advisement: Adkins' Motion to Suppress Evidence Obtained as a Result of

Search and Seizure [Docket No. 198]; Motion to Dismiss Consistent with <u>Gonzales

v. Oregon</u> [Docket No. 212]; Motion to Dismiss for Reasons of Double Jeopardy

[Docket No. 213]; Lieberman's Motion for Bill of Particulars [Docket No. 218];

Smith's Motion to Suppress [Docket No. 237]; and Griepp's Motion for Bill of

Particulars [Docket No. 240].  Griepp has also requested suppression of evidence

obtained as a result of search and seizure.

## II.    BACKGROUND

The Second Superseding Indictment was filed on March 21, 2006, against

five defendants, Christopher Smith, Philip Mach, Bruce Lieberman, Daniel Adkins,

and Darrell Griepp.  Count One alleges conspiracy to distribute and dispense

controlled substances against all five Defendants.  Counts Two through Seven

allege wire fraud against Smith, Mach, Adkins, and Griepp.  Counts Eight through

Ten allege unlawful distribution and dispensing of controlled substances against

all five Defendants.  Counts Eleven through Fifteen allege introduction of

2

misbranded drugs into interstate commerce against all five Defendants.  Count

Sixteen alleges conspiracy to commit money laundering against Smith and

Lieberman.  Count Seventeen alleges continuing criminal enterprise against

Smith.

The parties have filed approximately forty pretrial motions.  The Court

heard oral argument on those motions on May 1, 2006, as well as the testimony of

Agent Chad Vetter and Defendant Smith with regard to the motions to suppress

evidence seized as a result of the various search warrants.

## III.   DISCUSSION

### A.   Motions to Dismiss

#### 1.   Motion to Dismiss Consistent with <u>Gonzales v. Oregon</u> [Docket No. 212]

Lieberman, joined by Smith, Adkins, and Griepp, moves to dismiss the

charges against him on the grounds that the federal Government cannot set the

standards for the practice of medicine online.  Lieberman notes that there is no

federal statute which specifically prohibits the distribution of prescription drugs

online.  He claims that the prescriptions in this case were issued by a licensed

physician, filled by a licensed pharmacy, and sent to customers who requested the

drugs.

Lieberman's motion is based on the recent Supreme Court holding that the

Attorney General "is not authorized to make a rule declaring illegitimate a

3

medical standard for care and treatment of patients that is specifically authorized under state law." Gonzales v. Oregon, 546 U.S. __, 126 S. Ct. 904, 916 (2006). The Attorney General does not have the "authority to declare an entire class of activity outside the course of professional practice and therefore a criminal violation of the CSA ["Controlled Substances Act"]." Id. at 909.

   "[T]he CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules." Id. at 911 (citation omitted).  "Dispensing controlled substances without a valid prescription . . . furthermore, is a federal crime." Id. at 914 (citations omitted).  A regulation promulgated under the CSA "requires that every prescription for a controlled substance 'be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'" Id. at 912 (quoting 21 C.F.R. § 1306.04(a) (2005)).  In Gonzales, the Supreme Court determined that the Attorney General was not empowered to declare physician-assisted suicide illegal under the CSA, when it was explicitly permitted by Oregon law.  Id. at 925.

   The Supreme Court noted that it was not deciding whether "deference would be warranted for an interpretation issued by the Attorney General concerning matters closer to his role under the CSA, namely preventing doctors from engaging in illicit drug trafficking." Gonzales, 126 S. Ct. at 922.

4

Furthermore, the opinion did not address prosecution decisions by the Government.

Under Gonzales, the Government enforces the CSA in light of the states' regulation of the practice of medicine.  Id. at 923.  However, the Supreme Court made clear that "Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood;" the CSA "bars doctors from peddling to patients who crave the drugs for those prohibited uses."  Id. at 923, 925 (citing United States v. Moore, 423 U.S. 122, 135 (1975)).  The ultimate decision of whether a doctor's conduct exceeded the bounds of professional practice is decided by the jury.  See Moore, 423 U.S. at 142-43 (holding that "[t]he evidence presented at trial was sufficient for the jury to find that respondent's conduct exceeded the bounds of "professional practice,'" where "he gave inadequate physical examinations or none at all," ignored test results, "took no precautions against [methadone's] misuse and diversion," "did not regulate the dosage at all, prescribing as much and as frequently as the patient demanded," charged not for medical services but by the "number of tablets desired," and "acted as a large-scale 'pusher' not as a physician").

In this case, there is no applicable state law explicitly permitting the issuance of prescriptions online in the manner alleged in the Second Superseding

Indictment.  In fact, New Jersey, the state from which Mach practiced, has

administrative rules requiring physical examinations before a physician distributes

a controlled substance.  N.J. Admin. Code 13:35-7.1a, 7.6.  Minnesota law does

permit out-of-state physicians to provide medical services in a limited manner to

patients within Minnesota, provided that they follow certain requirements,

including registration with the state.  Minn. Stat. § 147.032.  However, there is no

showing that Defendants met the requirements of the Minnesota statute.

Because no applicable state law clearly permits Defendants' conduct, the

Government's prosecution will not invalidate an express state law.  The

Government's prosecution falls within the bounds of the CSA to regulate illicit

drug trafficking and dealing.  Gonzales does not provide a basis for dismissal of

the indictment.  See United States v. Edwin, No. 05 CR 0490, 2006 WL 763653, at

*5 (N.D. Ill. Mar. 22, 2006)  (denying defendant's motion to dismiss indictment for

distributing hydrocodone not for a legitimate medical purpose in the usual course

of his professional medical practice based on Gonzales and holding that Gonzales

did not invalidate federal regulation requiring prescriptions for controlled

substances to be issued for a "legitimate medical purpose" by an individual

practitioner acting in the usual course of his professional practice) (citing 21

C.F.R. § 1306.04).

Finally, Lieberman's argument that the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA") prohibited him from viewing the online

pharmacy's patient records and knowing which patients were receiving drugs

from the pharmacy and for what purpose does not support a motion to dismiss.

Simply because HIPAA may have prohibited Lieberman from knowing certain

patient information, a proposition which Lieberman has not supported with any

specific statutory or regulatory citation, does not mean that he could not possibly

have possessed the knowledge or intent required by the charges in the Second

Superseding Indictment.  In any case, the Government does not allege that the

online pharmacy followed HIPAA regulations.

For the above reasons, the Court denies the motion to dismiss based on

Gonzalez.

### 2.   Motion to Dismiss for Reasons of Double Jeopardy [Docket No. 213]

Lieberman, joined by Smith, also moves to dismiss the Second Superseding

Indictment on the grounds that jeopardy attached at his trial on the criminal

contempt charges.  The criminal contempt Order to Show Cause, dated June 24,

2005, charged Lieberman and Smith with knowingly and willfully violating the

May 20, 2005, civil Preliminary Injunction against them by participating in

"operating a business that purports to sell or provide prescription drugs to the

public in violation of the wire and mail fraud statutes" and "operating or

controlling any website that purports to sell or provide prescription drugs to the

public under any name or title in violation of the mail and wire fraud statutes."
Smith was also accused of violating the Preliminary Injunction freezing his assets
by withdrawing money from a frozen account, but that charge is not at issue here.

The Second Superseding Indictment charges Lieberman with conspiracy to
distribute and dispense controlled substances, lasting from January 2004 until
June 24, 2005; unlawful distribution and dispensing of controlled substances on
March 31, 2005; April 29, 2005; and May 6, 2005; introduction of misbranded
drugs into interstate commerce on March 31, 2005; April 20, 2005; April 25, 2005;
and April 28, 2005; and conspiracy to commit money laundering, for the period
September 2004 through June 24, 2005.  Lieberman is not charged with wire or
mail fraud.

Smith is charged with the same counts, plus multiple counts of wire fraud
occurring on March 25, 2005; April 11, 2005; April 14, 2005; and April 29, 2005;
and continuing criminal enterprise for the period January 2004 until June 24,
2005.

On July 6, 2005, a trial commenced on the criminal contempt charges to
determine whether Lieberman and Smith committed criminal contempt by
violating the Preliminary Injunction in the manner previously described.  On
September 15, 2005, the Court deferred final disposition of the contempt
proceedings until the conclusion of this criminal case.

"[C]riminal contempt, at least in its nonsummary form, 'is a crime in every fundamental respect.'"  United States v. Dixon, 509 U.S. 688, 699-700 (1993).  In this case, jeopardy attached at the start of the two days of testimony on July 6, 2005.  Serfass v. United States, 420 U.S. 377, 388 (1975) ("In a nonjury trial, jeopardy attaches when the court begins to hear evidence.").

The Double Jeopardy clause provides that "no person shall be subject for the same offence to be twice put in jeopardy of life or limb."  United States v. Dixon, 509 U.S. 688, 695-96 (1993) (quoting U.S. Const., Amend. 5).  Thus, a defendant cannot be subjected to " successive punishments [or] to successive prosecutions for the same criminal offense."  Id. at 696.  "[W]here the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies.  The same-elements test, sometimes referred to as the 'Blockburger' test, inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."  Id. (citations omitted).

In Dixon, the Supreme Court held that the criminal contempt prosecution of the defendant for possessing cocaine in violation of a pretrial release order for the underlying second degree murder charge barred a subsequent criminal prosecution based on possession of that same cocaine with intent to distribute.  Id.

at 691-92, 699-700.  The court reasoned that the "drug offense did not include any element not contained in his previous contempt offense."  Id. at 700.  The drug offense was a type of lesser included offense.  Id. at 698.

Lieberman argues that, in this case, the Preliminary Injunction barred him from committing wire and mail fraud, laundering funds, and distributing drugs over the internet.  Similarly, the Second Superceding Indictment accuses him of conspiracy and distribution of drugs and money laundering.  Additionally, he claims that the contempt citation has no time limit and the offenses were continuous.  He notes that the Government's contempt case included witnesses who had involvement in Smith's business both before and after May 2005.

Double jeopardy does not bar any of the charges against Lieberman or Smith.  To determine whether double jeopardy applies, the Court does not look at the contents of the Preliminary Injunction, which is a preliminary, civil, remedial matter, that does not constitute punishment and is related to the current criminal prosecution.  See, e.g., United States v. Volanty, 79 F.3d 86, 89 (8th Cir. 1996) ("Concurrent civil and criminal proceedings, based on the same facts, do not violate the double jeopardy clause when the separate proceedings take the form of a 'single, coordinated prosecution.'") (citation omitted); S.E.C. v. O'Hagan, 901 F. Supp. 1461, 1470 (D. Minn. 1995) ("As to the permanent injunction, [defendant] cites no authority that an order enjoining future securities violations is anything

but remedial and the Court thus rejects that claim.").  Instead, the Court must

analyze the charges in the criminal contempt trial: charges of criminal contempt

that include violation of the mail and wire fraud statute as included elements.

(The contempt charges also contain other elements, such as the existence of a

lawful and reasonably specific order of the court, notice of the order, and willful

disobedience of that order.  United States v. KS & W Offshore Eng'g, Inc., 932 F.2d

906, 909 (11th Cir. 1991); United States v. Powers, 629 F.2d 619, 627 (9th Cir.

1980).)  Lieberman is not charged with mail or wire fraud in the Second

Superseding Indictment.  The criminal contempt charge, based on mail and wire

fraud, contains additional elements not contained in the current criminal charges,

and the current criminal charges against Lieberman each contain different

elements not contained in the contempt charge.  The motion to dismiss the counts

against Lieberman on grounds of double jeopardy is denied.

Similarly, the non-wire fraud charges against Smith are not barred under

the Blockburger test because they each contain additional elements not contained

in the criminal contempt charge, and the criminal contempt charge contains

additional elements not contained in the non-wire fraud charges.

Unlike Lieberman, Smith was charged with wire fraud in the criminal case,

and wire and mail fraud were lesser included offenses in the contempt charges.

Despite the fact that wire fraud is a generally a lesser included offense of the

criminal contempt charge, there is no double jeopardy bar in this case.  "If the individual acts are the target of the law, then separate indictments and prosecutions are permissible, even if the acts together constitute a common course of action."  United States v. Gardner, 65 F.3d 82, 85 (8th Cir. 1995).  "So it is with the mail fraud statute.  Under 18 U.S.C. § 1341, it is not the plan or scheme that is punished, but rather each individual use of the mails in furtherance of that scheme."  Id.  Thus, even though multiple acts of mail or wire fraud may form part of one overall scheme and occurred during the same time period, "the separate instances of mailings in furtherance of the alleged fraud . . .  are separately prosecutable despite the presence of only one general scheme.  Further, the charges simply do not constitute the 'same offense' because each charge of mail fraud 'requires proof of an additional fact which the other does not,' namely the use of the mails specified for each particular count."  Id. (citations omitted).

Because the specific incidents of wire fraud alleged in the Second Superceding Indictment are based on different wires on different dates from the criminal contempt charges - all occurred before the issuance of the Preliminary Injunction and, thus, were not committed in violation of the Preliminary Injunction - double jeopardy does not apply to the wire fraud counts against Smith.  The motion to dismiss the counts against Smith on grounds of double jeopardy is denied.

**B.**     **Motions to Suppress**

      **1.**     **Smith's Motion to Suppress [Docket No. 237]**

Smith moves to suppress all evidence seized pursuant to certain search warrants applied for and issued in May 2005 on the grounds that those warrants were not described with sufficient particularity, were not supported by probable cause, and were obtained in bad faith.  In his post-hearing memoranda, Smith withdraws his motion to suppress with regard to multiple warrants, leaving only the following searches and warrants at issue: the Burnsville residence; the Prior Lake residence; Online Payment Solutions offices in Suite 150, 12400 Portland Avenue South, Burnsville, Minnesota; Same Day Pay Day offices in Suite 100, 12400 Portland Avenue South, Burnsville, Minnesota; Pixius Communications servers; Burnsville warehouse at 12010 12th Avenue, Burnsville, Minnesota; Ultimate Limousine offices at 12700 Zenith Avenue, Suite 105, Burnsville, Minnesota; 1996 white Hummer Limousine, 1996 black Hummer Limousine, and 2004 Cadillac DeVille Limousine.

All of the search warrants were based on the same search warrant affidavit prepared by Special Agent Chad Vetter.  Additionally, all of the search warrants contained substantially the same attachment listing items to be searched and seized.

      **a.**     **Standing**

13

The Government alleges that Smith does not have standing to challenge the searches, other than the searches of his homes, because most of the warrants were for businesses or vehicles not in Smith's name.  In its post-hearing memorandum, the Government concedes that Smith has standing to object to the searches of the Prior Lake residence and the Burnsville residence.

### i.     Standard

"One claiming a Fourth Amendment violation must show that: (1) he had a legitimate expectation of privacy, and (2) that expectation was invaded by government action."  United States v. Welliver, 976 F.2d 1148, 1151 (8th Cir. 1992).  In order to determine whether a defendant has a legitimate expectation of privacy in the thing searched, the Court asks two questions: 1) whether the defendant "asserted a subjective expectation of privacy," and 2) whether that "subjective expectation is objectively reasonable."  Id.

Fourth Amendment rights are personal and may not be asserted vicariously. United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).  In order to demonstrate standing, a defendant bears the burden of proving that he has a reasonable expectation of privacy in the area that was searched.  Id.

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific

14

facts of the case.

Id. (citations omitted).

### ii.    Automobiles

Smith asserts that he has standing to object to the searches of three vehicles: the 1996 white Hummer Limousine, the 1996 black Hummer Limousine, and the 2004 Cadillac DeVille Limousine.  "[A] person has no reasonable expectation of privacy in an automobile belonging to another."  United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) (citing Rakas v. Illinois, 439 U.S. 128, 148-49 (1978)).  "[W]here defendants had no possessory interest in the vehicle searched, they had no legitimate expectation of privacy therein."  United States v. Macklin, 902 F.2d 1320, 1330 (8th Cir. 1990) (citation omitted).  "[T]o have a legitimate expectation of privacy by way of a possessory interest, defendant must have possession of the vehicle and the keys."  Id. (citations omitted).  The mere fact that defendant purchased the vehicles in a corporate name does not confer standing.  See United States v. Willis, 759 F.2d 1486, 1499 (11th Cir. 1985) (holding defendant failed to establish standing to object to vehicle searches when only nexus was that defendant bought vehicles in name of corporation, but no evidence existed regarding "the source of the money used to purchase the vehicles, nor any proof that [defendant] had ever driven or even been in the cars").

At the hearing, Smith testified that he had an expectation of privacy within his automobiles, although he did not explicitly refer to the three vehicles now at issue.  (Tr. at 62.)  Smith also testified that he purchased the automobiles with corporate funds that were loans from the company, Online Payment Solutions, and "[s]ome of them were" exclusively his, and "[if] not mine, the company's." (Id.)  He asserted that people could not use the vehicles without his permission. (Id.)

Smith also testified that he drove some of the cars himself and also had a driver, James Howard.  (Id. at 53.)  The search warrant affidavit listed all three vehicles as Smith's assets.  (Search Warrant Aff. ¶ 43.)  Smith testified that he "had a fax machine and everything in [his] limo and [he] used it as an office.  So it was very private.  That was more of [his] office than [his] actual office."  (Tr. at 62.)

The Government asserts that the vehicles were corporate vehicles, not personal space in which Smith had a privacy interest.  Smith testified that each vehicle was purchased by "the company . . . as a loan to [him] as the CEO."  (Tr. at 52.)  As for the black Hummer, it was originally purchased for Online Payment Solutions to transport employees but then was leased to Anita Smith for the Ultimate Limousine business.  (Tr. at 52-54.)  The white Hummer and the Cadillac DeVille were also leased to the limousine business.  (Id. at 54.)

16

Although Smith stated that he used his "limo" as a private office, the Court finds that Smith was not referring to any of the three vehicles at issue, but to the Mercedes Maybach, from which no evidence was seized.  Smith denied using either Hummer as an office, noting that they did not "even have heat."  (Tr. at 53.)  He also referred to "[t]he limousine" as "the Maybach:"

> Q. And wasn't it the case that the cars were used for business purposes as opposed to for you own personal use?
>
> A. Some of them were used for business purposes.
>
> Q. Which ones?
>
> A. The limousine, the Maybach.

(Id.)

The Court determines that Smith has not demonstrated standing to object to the search of the three vehicles at issue.  Smith initially purchased the vehicles with corporate money, and then the three vehicles were leased to Ultimate Limousine for use in the limousine business.  Smith answered affirmatively to the question "Did you ever drive any of the cars yourself?"  (Tr. at 53.)  However, he did not testify that he drove or rode in the three specific vehicles at issue; his testimony does not show that he had a reasonable expectation of privacy in the white Hummer, black Hummer, or 2004 Cadillac DeVille limousines.  Keeping in mind that Smith bears the burden of establishing standing, the Court holds that he does not have standing to object to the searches of those three vehicles.

17

### iii.     Warehouse and Business Locations

Smith objects to the warrants issued to search the premises of Same Day Pay Day, Online Payment Solutions, Ultimate Limousine, and the Burnsville warehouse.  He claims that he owned, operated, regulated access to, or controlled the property at each business location.

"It has long been settled that one has standing to object to a search of his office, as well as of his home."  Mancusi v. DeForte, 392 U.S. 364, 369 (1968).  If a defendant "occupied a 'private' office," then he would have standing to challenge the seizure of records from his desk or filing cabinet.  Id.  Even if the defendant shared his office with others, it is possible that he "still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of . . . higher-ups."  Id.

However, a defendant does not have standing to object to a seizure of corporate records merely because he is a corporate officer.  United States v. Britt, 508 F.2d 1052, 1055-56 (5th Cir. 1975).  There must be a "demonstrated nexus between the area searched and the work space of the defendant."  Id. at 1056.  So, where "plaintiffs worked in a large two-room shed that contained 75 people[,] . . . had no private space in any part of the building, and no authority to exclude others," they had no reasonable expectation of privacy in the workplace.  Martinez

v. Nygaard, 831 F.2d 822, 826 (9th Cir. 1987).

### aa.   Online Payment Solutions Suite

Smith testified that he established the lease for the suite using Online Payment Solutions' funds and controlled everything in this office.  (Tr. at 27, 57-58.)  He engineered a security system for it and exclusively regulated access to it.  (Id. at 27-28, 33.)  He testified that no one could enter or exit or use anything within the office without his authorization.  (Id. at 57.)  Smith claimed he had the absolute right to look at anything and access anything in these office at all times, and that everyone in the office knew this.  (Id. at 58.)

The Government asserts that Smith cannot show a privacy interest because the areas searched consisted of other employees' work spaces or areas in which Smith failed to maintain exclusive control.

> Whether a corporate officer has standing to challenge the search of business premises depends upon whether the officer has made a "sufficient showing of a possessory or proprietary interest in the area searched," and whether the officer has demonstrated a sufficient nexus between the area searched and his own work place.  Generally, courts tend to find that these two elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office.  However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched.  The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found.  By contrast, the less private a work area-and the less control a defendant has over that work area-the less likely standing is to be found.

United States v. Najarian, 915 F. Supp. 1441, 1452 (D. Minn. 1995) (quoting

19

United States v. Hamdan, 891 F. Supp. 88, 94-95 (E.D.N.Y. 1995)) (citations omitted).

The Government asserts that Smith cannot establish an expectation of privacy over the telemarketing area of the office suites. It notes that there were over one hundred employees who worked at various work stations, including over seventy-five sales agents or telemarketers. (Tr. at 32, 35.) Smith did not use any of those computers; nor did he otherwise occupy those work spaces. (Tr. at 35.) The Government also notes that managers and other employees had their own computers in their own offices or work space within the office suite. (Tr. at 36-38.)

The Government further claims that Smith does not have standing with respect to his own office and computer in the Online Payment Solutions suite because others, including Terry Chang, had access to Smith's office and computers and the computers were not locked. (Tr. at 43.) It argues that the lack of exclusivity negates Smith's expectation of privacy in his office or computers.

The Court concludes that Smith clearly has standing to object to the search of his personal office and computer. Under Mancusi, the fact that he shared his space with others does not negate his reasonable expectation that only those persons or their guests would enter his office and that no one would touch his records without his or their permission. Additionally, the Court concludes that

Smith has standing to object to the search of the rest of the Online Payment

Solutions suite.  Although much of the suite consisted of an area that was open to

scores of employees at open workstations, Smith owned and controlled the

company, participated heavily in its affairs, was present in and controlled access to

the suite, and had his office in the suite.  These facts are "sufficient for the Court

to find that he had a legitimate expectation of privacy in the entire suite of [the

company's] offices."  United States v. Schwimmer, 692 F. Supp. 119, 125 (E.D.N.Y.

1988).

### bb.    Same Day Pay Day Suite

Smith makes the same argument for Same Day Pay Day as he does for

Online Payment Solutions.  However, unlike the Online Payment Solutions suite,

the Same Day Pay Day suite did not contain Smith's office.  The Same Day Pay

Day offices in Suite 100 housed offices for Griepp and Adkins.  (Tr. at 42.)

Although Smith had a desk in that suite, he only used it "occasionally" to assist

with employee training by making photocopies, but not to create or print

documents or use a computer.  (Id.)  Court are "skeptical of standing claims when

the defendant only occasionally used the area to be searched."  Najarian, 915 F.

Supp. at 1452.

The Court concludes that Smith has not met his burden of demonstrating

standing to object to the search of Same Day Pay Day.  Although Smith exercised

some control over the office suite by establishing the security system for the office and limiting access to the suite, Smith was not the day-to-day user of the corporation's suite.  He did not have a private office in the suite, but only a desk that he occasionally used.  He has not shown the required nexus between the Same Day Pay Day suite and his personal work area, which was located in another office suite.

### cc.    Ultimate Limousine

Smith testified at the hearing that he and his wife operated Ultimate Limousine.  (<u>Id.</u> at 46, 58-60.)  They exclusively controlled access to the locked office of Ultimate Limousine.  (<u>Id.</u> at 47, 58-60.)  He testified that he and his wife had an expectation of privacy in the Ultimate Limousine offices to the exclusion of anyone else.  (<u>Id.</u> at 58-59.)  Thus, he argues, he had an objectively reasonable expectation of privacy.

However, Smith only visited the Ultimate Limousine offices once a week for a few hours or less, had no office space there, and kept no documents or other materials there.  (Tr. at 46-47.)  Other employees worked there and customers came in and out to pay for their limousines.  (<u>Id.</u> at 47.)

Although Smith co-owned the business that operated the premises, he had no private space on the premises, stored no belongings or documents there, and rarely visited.  Smith bears the burden of establishing standing.  The Court

concludes that Smith does not have standing to object to the search of the Ultimate Limousine premises.

### dd.   Warehouse

Smith also claims that he had a reasonable expectation of privacy in the Burnsville warehouse, which he personally leased to store property.  He testified that he had "100 percent control" over a portion of the warehouse that he leased and that the warehouse was always locked.  (Tr. at 44, 60.)  On the other hand, Smith also testified that the owner of the warehouse, Paul Gonyea, allowed his "friends [and] relatives" to use another portion of the warehouse, and "[w]hoever wanted to put their stuff there, they put stuff there."  (Tr. at 44.)  The portion of the warehouse that Smith used was not isolated or segregated from the other portions.  (Id.)  Instead, "it was a mess," and was all mixed together because "everybody kept dumping stuff there."  (Id.)  Additionally, Ron Miller had access to the warehouse and would move items around.  (Id. at 45.)  Smith did not even know the identities of all of the people who stored items in the warehouse space. (Id. at 46.)

Smith did not have exclusive control over the warehouse space and his items were mixed in with the items of other unknown people.  However, the Court concludes that Smith had a reasonable expectation of privacy in his area of the warehouse and has standing to object to the search of the warehouse because

Smith leased the space for his personal use, not for corporate use by one of his

business entities; he paid to store his property there; and the facility was locked.

See United States v. Johns, 851 F.2d 1131, 1136 (9th Cir. 1988) (holding that

defendant had standing to object to search of storage unit when he co-owned the

items found in the storage unit and paid a portion of the rental payments on the

unit).

### iv.    Pixius Communications

Smith asserts that he had a reasonable expectation of privacy in the servers,

web sites, and data related to his businesses that were seized from Pixius

Communications.  The space at Pixius was leased by Online Payment Solutions for

storage of servers dedicated to Online Payment Solutions and other businesses.

Smith testified that he personally signed the Pixius lease.  (Tr. at 48.)  He also

testified that he wanted to securely store confidential and private data, such as

patient information.  (Id. at 61.)  Further, Smith testified that he had the exclusive

right to regulate access to the servers stored at Pixius and no one from his

companies could access that data without his permission.  (Id.)

The Government asserts that Smith had no individual privacy interest in the

corporate data on the servers and failed to maintain exclusive control over the

data.  The data on the servers consisted of Online Payment Solutions' corporate

data: information inputted from customers who ordered from the online

pharmacy.  (Tr. at 47-48.)  Network Administrator Perry Scott and Berni Hollis also had access to the servers for their work for Online Payment Solutions.  (<u>Id.</u> at 48.)  The Government notes that "[w]hen corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched."  <u>United States v. Vicknair</u>, 610 F.2d 372, 379 (5th Cir. 1980).

The Government also notes that the stored electronic communications housed on the Pixius servers are covered by the Electronic Communications Privacy Act.  18 U.S.C. § 2703.  However, this Act does not influence the Court's standing analysis, as violation of the Act does not warrant suppression, but rather, only civil damages.  <u>United States v. Hambrick</u>, 55 F. Supp. 2d 504, 507 (W.D. Va. 1999); <u>see also</u> 18 U.S.C. § 2708.  To have a reasonable expectation of privacy in data obtained from an internet service provider, "(1) the data must not be knowingly exposed to others, and (2) the Internet service provider's ability to access the data must not constitute a disclosure."  <u>Id.</u>

Smith signed the Pixius lease as the representative for Online Payment Solutions, Inc., and, as president, he exercised control over the servers and leased space.  Further, the search of the Pixius location was, at least in part, directed at Smith.  On the other hand, the Pixius space was leased by Online Payment

Solutions, Inc., not by Smith personally, and the servers contained corporate customer data, not specifically prepared by Smith.  Additionally, under the contract between Pixius and Online Payment Solutions, Pixius "reserve[d] the right to release subscriber information to comply with an investigation into any activity which violates these terms and may report such activity to the appropriate authorities."  (Pixius Service Agreement at 4, Ex. A to Gov't Post-Hearing Brief.)

The question of standing is close in this case.  However, the Court has already determined that Smith has standing to object to the search of Online Payment Solutions' office suite based on Smith's control over that area, day-to-day presence there, and control over the business.  The Pixius servers were an extension of Online Payment Solutions' office.  Thus, the Court concludes that Smith has standing to object to the search of the Pixius location.

### b.   Probable Cause and Particularity

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'"  <u>Maryland v. Garrison</u>, 480 U.S. 79, 84 (1987).  "To satisfy the particularity requirement of the Fourth Amendment, the items to be seized and the places to be searched must be described with sufficient particularity as to enable the searcher to locate and identify the places and items with reasonable effort and to avoid mistakenly

searching the wrong places or seizing the wrong items." United States v. Gleich,

397 F.3d 608, 611 (8th Cir. 2005) (citations omitted).

> Each of the warrants at issue authorized seizure of
>
> any and all evidence, property, records and information related to
> the following [forty-four listed] individual and/or businesses . . . for
> the time period of January 1, 2001 to the present, all of which are
> evidence, fruits, and instrumentalities of [tax evasion, willful failure
> to file a tax return or pay taxes, money laundering, mail and wire
> fraud, misbranding drugs, and a drug conspiracy], and to include the
> following: [nineteen listed items].

Smith argues that the warrants in this case were overly broad.  He asserts

that they permitted seizure of items such as a pistol, correspondence with

attorneys, fireworks, personal photos, switchblades, and a passport.  He asserts

that these items are not related to the charges against him.

Smith further argues that there was insufficient probable cause that he

engaged in illegal activity from 2001 to 2004 that would lead a reasonable person

to believe that contraband or evidence of any crime committed during that time

period would be found in his houses, businesses, or vehicles.  "Probable cause

exists if, based upon a common-sense consideration of all the circumstances set

forth in the supporting affidavit, there is a fair probability that contraband or

evidence of a crime will be found in a particular place." United States v. Curry,

911 F.2d 72, 75 (8th Cir. 1990) (citation omitted).  The Court grants "great

deference" to the magistrate judge's decision that an affidavit establishes probable

cause for a warrant.  Id.  The warrant will be upheld if the magistrate judge "had a substantial basis for . . . conclud[ing] that probable cause existed."  Id. (citations omitted).

Smith asserts that because the warrants covered the period 2001-2005, probable cause was lacking for more than two-thirds of the time frame covered by the warrants.  He notes that the "Synopsis of Investigation" does not mention any alleged illegality before 2004, as all of the allegations relate to the online pharmacy business.  (Warrant Aff. ¶¶ 4-7.)  Smith argues that the "Probable Cause Related to Evidence of Smith's Criminal Activity" only contains a few allegations related to Smith's activities before 2004, such as spamming, starting a pharmaceutical business in the summer of 2002, starting an online gambling web site in the "early 2000s," and failing to file personal or business income tax returns.

Smith claims that there is no proof that he violated any particular law by spamming, that the spamming allegations are vague statements about Smith's reputation without any factual basis, and that spamming was not a federal crime before 2004.  Additionally, even though the affidavit alleges that he failed to file income taxes from 2001 through 2004, Smith argues that there is no allegation that this action was illegal or willful.  Further, there is no information on whether Witness A, who provided information on pharmaceutical sales prior to 2004, was

28

an impartial informant or a veracious person who had a sound basis of knowledge at to the alleged statements.  Thus, there is no means of assessing the reliability of Witness A's statement.

The Court concludes that the warrants were not overly broad or lacking sufficient probable cause.  The warrant affidavit demonstrated probable cause that fraud permeated Smith's entire online pharmacy businesses - from illegally billing customers to selling illegal prescription drugs.  It provided great detail regarding the fraudulent aspects of the online pharmacy.  It also demonstrated probable cause that Smith's fraudulent pharmacy business was financially interconnected with the other businesses and that illegal proceeds were used to purchase assets, such as the vehicles to be searched.

The warrant affidavit showed probable cause for tax violations from 2001 through 2004 by showing deposits of millions of dollars into Online Payment Solutions' account and no income tax returns filed, and by showing millions of dollars of assets belonging to Smith, who declared bankruptcy in 2002, and no income tax returns filed by him.  Additionally, even if spamming was not specifically prohibited by federal law until 2004, the warrant affidavit's description of the spamming and phishing committed by Smith would constitute wire fraud. The probable cause finding exists even without considering statements by Witness A.

Even if the warrant affidavit did not show that Smith was conducting illegal activities from 2001 through 2004, the affidavit establishes that Smith's activities during that time period were part of his planning and pattern in a scheme to defraud.  See United States v. Brien, 617 F.2d 299, 307 (1st Cir. 1980) ("Since a scheme involves some connotation of planning and pattern, it follows that evidence of planning and pattern may show the existence of a scheme.") (citations omitted).

Where fraud pervades a business, it is difficult to particularly describe business records that would be evidence of fraud as opposed to those that would not.  United States v. Kail, 804 F.2d 441, 445 (8th Cir. 1986).  In Kail, the Eighth Circuit upheld a warrant even though it "was broad in the sense that it allowed inspectors to seize almost all of the business records" of the business because "there was probable cause to believe that fraud permeated the entire business operation."  Id.  Under Kail, the broad list of items to be seized in the search warrants in this case, was justified.

Because the warrant affidavit demonstrated probable cause to believe that the fraud permeated Smith's entire business, and then tied each other location, business, and vehicle to be searched to that fraud, the broad nature of the warrant is valid under Kail.

### c.   Bad Faith

### i.    **Franks** Challenge

Smith also alleges that the affiant created the warrant affidavit in bad faith and alleged probable cause for Smith's pre-2004 activities as a pretext for obtaining search warrants that were overly broad.  A warrant must be held invalid in its entirety when obtained in bad faith.  See United States v. Pitts, 173 F.3d 677, 681 n.5 (8th Cir. 1999).

By claiming that the search warrants were based on false or misleading statements, Smith appears to be asserting a challenge to the search warrant affidavit under Franks v. Delaware, 438 U.S. 154 (1978).  "To prevail on his Franks challenge, [a defendant] must establish (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and (2) that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." United States v. Searcy, 181 F.3d 975, 980 (8th Cir. 1999) (citation omitted). "The defendant bears the burden of proving by a preponderance of the evidence that the affiant intentionally or recklessly included false statements in a warrant affidavit."  United States v. Gipp, 147 F.3d 680, 688 (8th Cir. 1998) (citations omitted).

### ii.    **Tax Returns**

Smith's main contention is that, in the search warrant affidavit, Agent

Vetter falsely averred that "to date Christopher Smith has never filed any individual income tax returns with the Internal Revenue Service (IRS)," and that "IRS records revealed that no tax returns have been filed for any of his businesses, including Rizler and Online Payment Solutions." (Warrant Aff. ¶ 44.)

Smith did, in fact, file personal income tax returns for the years 2001-2004. (Appx. F to Smith Second Supp. Brief.) He mailed these returns on April 15, 2005. (Supp. Vetter Aff. ¶ 6). The returns were received by the IRS on approximately April 27, 2005. (Id.; Appx. F to Smith's Second Supp. Brief.) The returns were not posted to the IRS database until July 4, 2005, after the search warrants were executed. (Supp. Vetter Aff. ¶ 6.)

Additionally, Rizler filed IRS Forms 941 and 940 and timely paid those employee-related taxes for Rizler for part of 2000 and part of 2001, all of which were received by the IRS long before Vetter signed the warrant affidavit. (Appx. F to Smith's Second Supp. Brief.)

In Vetter's Supplemental Affidavit, Vetter stated that he concluded that Smith had never filed individual income tax returns because: 1) "In or about January 2005, I had reviewed IRS database records to determine if Christopher or Anita Smith had filed any tax returns for the tax years 2002, 2003, or 2004. There were no records of any filings." (Supp. Vetter Aff. ¶ 4.); and 2) "On February 1st, 2005, I placed '914 controls' in accordance with IRS policy with respect to any

32

subsequent tax return filings by Christopher or Anita Smith." (Id.)  Once the controls were in place, the IRS would notify him if the Smiths filed any tax returns or had any tax return information filed with the IRS.  (Id.)  He was not so notified. (Id.)

Vetter also explained that, at the time of the search warrant affidavit, he was aware that Rizler had submitted IRS Forms 941 and 940.  (Second Supp. Vetter Aff. ¶ 2.)  However, he believed his statement that "no tax returns have been filed for any of his businesses, including Rizler and Online Payment Solutions" was true because he did not view Rizler's filings as tax returns.  (Id.) Instead they reflected wages paid to employees and withholdings kept back from those employees.  (Id.)  Although they were technically "tax returns," they did not show gross receipts for Smith's Rizler business.  (Id.)  Thus, the Rizler filings did not provide the Government with the basis to assess unpaid taxes from revenues generated by Online Payment Solutions or Smith.  Vetter avers that if he made a mistake in the search warrant affidavit, the mistake was unintentional and not done with an intention to mislead.  (Id.)  There is no assertion that Online Payment Solutions filed any tax returns.

Smith asserts that Vetter's explanations would only support a statement that Smith failed to file income tax returns in 2002, 2003, and 2004, but not that Smith had never filed personal income tax returns or business returns.  He claims that

either Vetter knew of the Rizler tax returns but lied in his search warrant affidavit

or Vetter lied when he stated that he investigated the IRS records, when, in fact,

he conducted no such investigation.  Smith claims that either scenario constitutes

bad faith, so the warrants should be held invalid in their entirety.  Smith

continues that without the false allegations of tax evasion, Vetter's affidavit would

not have provided the magistrate with a substantial basis to make the same

probable cause determination.

The evidence before the Court demonstrates that Vetter made the

statements regarding the tax returns in the good faith belief that they were true.

Vetter was reasonable to believe that Chris and Anita Smith had filed no tax

returns from 2002 through the date of the warrant application because he

checked the IRS records and found that neither had filed any returns for 2002-

2004.  Further, he requested to be notified of any tax filings, by "914 controls," but

was not so notified before the search warrant was requested.  Vetter's statement

regarding Smith's failure to file tax returns may have been careless in that he did

not check to see whether Smith filed tax returns for the years before 2002, when

he declared bankruptcy.  However, Smith does not allege that he did file pre-2002

tax returns, other than the late-filed 2001 return, and it is clear that despite

Vetter's IRS check and implementation of the 914 controls, he was not informed

of Smith's late tax filings for 2001 through 2004.  This carelessness does not rise to

the level of bad faith required by <u>Franks</u>.

Vetter's statement regarding Rizler's lack of tax returns may be technically false.  However, it also does not rise to the level of bad faith required because Rizler's filings were not tax returns of the type that showed income and taxes owed on corporate revenue or profits.  Vetter's belief that these forms did not constitute "tax returns" was not unreasonable or in bad faith.  Revelation of the information in the Rizler forms would not have negated the warrant affidavit's evidence of tax evasion.

Further, Smith is also unable to meet the second prong of the <u>Franks</u> test: "that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  <u>Searcy</u>, 181 F.3d at 980.  Even if the statements regarding Smith's and Rizler's lack of tax return filings were removed from the affidavit, ample evidence of tax evasion by Online Payment Solutions and Smith remained to support the finding of probable cause.  (Warrant Aff. ¶¶ 35-43, 45-47.)  Additionally, if the affidavit had more precisely stated that Smith had filed no income tax returns from only 2002 through the date of the affidavit, there would have been strong evidence of tax evasion.  The warrant affidavit also contained probable cause of commission of other crimes, such as money laundering, mail fraud, wire fraud, misbranding drugs, and conspiracy to dispense and possess with intent to dispense a controlled substance.

### iii.    Dates of Property Acquisition

As additional evidence that Vetter acted in bad faith in order to illegally search for items dating back to January 1, 2001, Smith claims that paragraph 43 of the warrant affidavit was created in a misleading manner by stating, "Since as early as 2001, Smith and his wife, Anita Smith, have acquired over $1,180,000 in vehicles and over $1,300,000 in residences . . ."  The facts presented elsewhere in the affidavit state that not one of Smith's automobiles was purchased before April 2004.  However, the chart in paragraph 43 lists the model years for the vehicles under the heading "Year," which could lead the reader to infer that the listed years, including the year 2001, were the years of acquisition.  Paragraph 197 lists the actual purchase dates for those vehicles.  Additionally, although the chart lists "2001" with the Burnsville Residence, Smith entered into a contract for deed for the residence in October 2000 and did not buy out the contract for deed until February 18, 2004.  (Warrant Aff. ¶ 138.)  According to paragraph 149 of the affidavit, the Prior Lake residence was not purchased until December 28, 2004.  Thus, Smith claims that there is no support for the statement that he acquired any assets before February 18, 2004.

The list of dates in paragraph 43 could be confusing.  However, the inclusion of the Burnsville home, with contract for deed payments beginning in 2000, supports the statement that Smith and his wife have been acquiring assets

"[s]ince as early as 2001."  Additionally, the actual purchase dates for all of the assets do clearly appear elsewhere in the affidavit.  Also, a reasonable magistrate could have correctly interpreted the "Year" column because some of the years listed - such as 1996 and 1997 - would make no sense as acquisition years because they would predate any alleged criminal activity and would have been acquired when Smith was still a minor.  Finally, lack of clarity alone does not demonstrate bad faith.  The Court concludes that Vetter did not act in bad faith in his crafting of paragraph 43.

### iv.      Corroboration for Confidential Witness

Smith also argues that Vetter failed to provide background information on Witness A or corroborate Witness A's allegations.  There is no evidence of bad faith regarding Vetter's use of Witness A.  Additionally, even if the Court excised all mentions of Witness A from the warrant affidavit, the warrant would be supported by probable cause.

### 2.      Adkins' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 198]

Adkins makes a boilerplate motion for suppression of any evidence seized without a warrant, probable cause, or exigent circumstances, or with a defective search warrant.  Adkins has set forth no legal or factual basis for suppression.  Nor has he asserted standing to object to the warrants, which cover other persons' homes, business premises, and vehicles.  Because Adkins has not attempted to

show standing to object to the search warrants in this case, the Court denies his motion to suppress.

### 3.    Griepp's Motion to Suppress

In his post-hearing memorandum in support of suppression of evidence obtained as a result of search and seizure, Griepp objects to the search warrant for Suite 100,[1] 12400 Portland Avenue South, Burnsville, Minnesota.  During that search, the Government seized documents and journals from his office.  Griepp argues that he has standing to object to the warrant because he possessed a private office space in that suite, complete with a door with a lock.  (Tr. at 26, 42.)

Griepp further argues that the search warrant and supporting affidavit were overly broad.  They failed to state with specificity the areas or items believed to be related to illegal activity, particularly with regard to Griepp.  The affidavit only briefly stated that the online pharmacy operated within the suite.  Griepp asserts that it does not state that Griepp was involved in any way in illegal activity.

Under Mancusi, Griepp has standing to object to the search of his office, which he used as a private space and had a locking door.  Mancusi v. DeForte, 392 U.S. 364, 369 (1968).  However, for the reasons discussed with regard to Smith's

---

[1]Griepp's memorandum refers to Suite 150, while the testimony regarding his private office refers to Suite 100.  (Tr. at 26, 42.)

motion to suppress, the Court concludes that the search warrant was not overbroad or otherwise invalid.  The warrant was supported by probable cause that fraud permeated the businesses in which Griepp's office was located, including Online Payment Solutions, Advanced Financial Services, and Same Day Pay Day.  See United States v. Kail, 804 F.2d 441, 445 (8th Cir. 1986).  Griepp's motion to suppress is denied.

### C.      Motions for Bills of Particulars

#### 1.      Lieberman's Motion for Bill of Particulars [Docket No. 218]

Lieberman requests a bill of particulars under Federal Rule of Criminal Procedure 7(f).  He requests three categories of information: 1) evidence that he knew and participated in the sales of drugs referred to in Counts 8 through 15; 2) how these offenses were accomplished with Lieberman's assistance; and 3) how, in light of HIPAA regulations, Lieberman could or should have known the precise nature of the medical problem at issue, the doctor's specific prescription, and whether a single doctor was signing the prescriptions.  At oral argument, Lieberman explained that the basic answer he seeks is whether the Government alleges he is liable as a co-conspirator for other Defendants' actions or whether the Government has evidence that Lieberman personally participated in the transactions that form the basis for the counts against him.

The Government responds that the Second Superseding Indictment

complies with Federal Rule of Criminal Procedure 7(c) by containing "a plain, concise, and definite written statement of the essential facts constituting the offense charged." "The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial;" it is not to be used for discovery purposes or to gather "evidentiary detail." United States v. Matlock, 675 F.2d 981, 986 (8th Cir. 1982); United States v. Hill, 589 F.2d 1344, 1352 (8th Cir. 1979).

Lieberman's name, along with the particular conduct in which he is alleged to have engaged is expressly set forth in paragraphs 4, 33-35, 39, 43-45, and 67-68. The Government represents that it has also provided extensive discovery to Lieberman specifying the details of the crimes alleged in the Second Superseding Indictment. The Government also separately copied and provided those documents that particularly pertained to Lieberman to him.

The Second Superceding Indictment states overt acts that Lieberman took under the conspiracy to distribute controlled substances count, Count I, naming Lieberman in paragraphs 43-45; states the dates and substances distributed, as well as the recipients and their locations, in the unlawful distribution and dispensing of controlled substances counts, Counts 8-10, in paragraph 58; states the dates and substances distributed, as well as the recipients and their locations, in the introduction of misbranded drugs counts, Counts 11-15, in paragraph 64;

and explains the means and manner of the conspiracy to commit money

laundering count, Count 16, in paragraphs 67-70.

A bill of particulars is not warranted "(1) to obtain the names of any

unknown coconspirators; (2) to determine the exact date on which the conspiracy

allegedly began; and (3) to delineate all other overt acts that comprised the

charged activity."  United States v. DiCesare, 765 F.2d 890, 897-98 (9th Cir.

1985).   It does not entitle defendant to information about the "exact dates and

specific acts the government alleges he performed" in the conspiracy because

"defendants in a conspiracy case may not obtain the . . .  whens, wheres, and with

whoms . . in a bill of particulars."  United States v. Diaz, 303 F. Supp. 2d. 84, 89

(D. Conn. 2004) (citation omitted).

The Second Superseding Indictment adequately informs Lieberman of the

allegations against him.  The Court concludes that a bill of particulars is not

warranted.

### 2.     Griepp's Motion for Bill of Particulars [Docket No. 240]

Griepp requests a bill of particulars under Federal Rule of Criminal

Procedure 7(f).  For each Count upon which Griepp was indicted, he requests 1)

evidence of his knowledge and participation in those counts; 2) how Griepp

assisted in the accomplishment of those offenses; and 3) in light of HIPAA

regulations, how he could or should have known the precise nature of the medical

problem at issue, the doctor's specific prescription, and whether a single doctor was signing the prescriptions.

The Government claims that the Second Superseding Indictment provides a plain, concise, and definitive statement of the essential facts and elements of each charge and that the purpose of a bill of particulars is not to provide the defendant with evidentiary detail or discovery.  It notes that the Second Superseding Indictment names Griepp in paragraphs 6, 28, 32, 34-35, and 50-54.  Paragraphs 28, 32, 34, and 35 explain acts taken by Griepp in furtherance of Count 1, conspiracy to distribute and dispense controlled substances.  Paragraphs 50 through 54 state the acts that Griepp committed to further the wire fraud, and paragraph 56 lists the date, origin, destination, means, and description of each act of wire fraud, Counts 2 through 7.  The distribution of controlled substances counts, Counts 8 through 10, and the misbranded drugs counts, Counts 11-15, state the dates and substances or drugs distributed, as well as the recipients and their locations.

As previously explained, a bill of particulars is not warranted "(1) to obtain the names of any unknown coconspirators; (2) to determine the exact date on which the conspiracy allegedly began; [or] (3) to delineate all other overt acts that comprised the charged activity."  United States v. DiCesare, 765 F.2d 890, 897-98 (9th Cir. 1985).  It does not entitle defendant to information about the

"exact dates and specific acts the government alleges he performed" in the conspiracy because "defendants in a conspiracy case may not obtain the '. . . whens, wheres, and with whoms . . in a bill of particulars." <u>United States v. Diaz</u>, 303 F. Supp. 2d. 84, 89 (D. Conn. 2004) (citation omitted).

The Second Superseding Indictment adequately informs Griepp of the allegations against him. The Court concludes that a bill of particulars is not warranted.

According, based upon the files, records, and proceedings herein, and upon the Court's oral rulings during the May 1, 2006 hearing, **IT IS HEREBY ORDERED** that:

1.    The Government's Motion for Discovery as to Defendant Christopher Smith [Docket No. 181] is **GRANTED**.

2.    The Government's Motion to Compel Handwriting Exemplars as to Smith [Docket No. 204] is **GRANTED**.  The Government shall provide reasonable notice to Smith's attorney when Smith is to be transported to provided the exemplar.

3.    Smith's Motion for Joinder as to Defendant Lieberman's Motions to Dismiss [Docket No. 226] is **GRANTED**.

4.    Motion to Dismiss Consistent with <u>Gonzales v. Oregon</u> [Docket No. 212] is **DENIED**.

5.    Motion to Dismiss for Reasons of Double Jeopardy [Docket No. 213] is **DENIED**.

6.      Smith's Motion to Suppress [Docket No. 237] is **DENIED**.

7.      The Government's Motion to Consolidate Cases for Trial [Docket No. 249] is **DENIED**.

8.      The Government's Motion for Discovery as to Defendant Philip Mach [Docket No. 182] is **GRANTED**.

9.      The Government's Motion for Discovery as to Defendant Bruce Lieberman [Docket No. 183] is **GRANTED**.

10.     The Government's Motion to Compel Handwriting Exemplars as to Lieberman [Docket No. 207] is **GRANTED**.

11.     Lieberman's Motion for Release of Brady Materials [Docket No. 214] is **GRANTED** to the extent required by <u>Giglio v. United States</u>, 405 U.S. 150 (1972) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

12.     Lieberman's Motion for Disclosure of Jencks Act Materials [Docket No. 215] is **GRANTED** follows: disclosure is due ten days before trial.

13.     Lieberman's Motion to Retain Rough Notes [Docket No. 216] is **GRANTED**; however, the Government is not required to disclose those rough notes to the defense.

14.     Lieberman's Motion to Strike Surplusage [Docket No. 217] is **DENIED**.

15.     Lieberman's Motion for Bill of Particulars [Docket No. 218] is **DENIED**.

16.     Lieberman's Motion to Sever Defendant Smith [Docket No. 219] is **DENIED AS MOOT**.

17.     Lieberman's Motion for Discovery [Docket No. 220] is **GRANTED** to the extent required by Federal Rule of Criminal Procedure 16.

18.     Lieberman's Motion for Disclosure of Rule 404 Materials [Docket No. 221] **GRANTED** as follows: Rule 404(b) materials are to be disclosed ten days before trial; however, the Government is not required to

provide a Rule 404(b) witness list.

19.   The Government's Motion for Discovery as to Daniel Adkins [Docket No. 184] is **GRANTED**.

20.   Adkins' Motion for Disclosure of 404(b) Evidence [Docket No. 189] is **GRANTED** as follows: Rule 404(b) materials are to be disclosed ten days before trial; however, the Government is not required to provide a Rule 404(b) witness list.

21.   Adkins' Motion for Discovery and Inspection [Docket No. 190] is **GRANTED** to the extent required by Federal Rule of Criminal Procedure 16.

22.   Adkins' Motion for Discovery of Expert [Docket No. 191] is **GRANTED** as follows: reciprocal expert disclosures are due from both Defendant and the Government thirty days before trial.

23.   Adkins' Motion for Disclosure of Jencks Act Material [Docket No. 192] is **GRANTED** follows: disclosure is due ten days before trial.

24.   Adkins' Motion to Retain Rough Notes [Docket No. 193] is **GRANTED**; however, the Government is not required to disclose those rough notes to the defense.

25.   Adkins' Motion for Government to Provide Grand Jury Testimony of Any Witness Who Will Testify at Suppression Hearing [Docket No. 194] is **DENIED AS MOOT**.

26.   Adkins' Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant [Docket No. 195] is **GRANTED** to the extent required by Giglio v. United States, 405 U.S. 150 (1972) and Brady v. Maryland, 373 U.S. 83 (1963).

27.   Adkins' Motion for Disclosure of Post Conspiracy Statements of Co-Defendants [Docket No. 196] is **GRANTED** as follows: the Government shall reveal such statements thirty days before trial.

28.   Adkins' Motion to Suppress Statements [Docket No. 197] is **WITHDRAWN**.

29.  Adkins' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 198] is **DENIED**.

30.  The Government's Motion to Compel Handwriting Exemplars as to Adkins [Docket No. 205] is **GRANTED**.

31.  Adkins' Motion to Join Defendant Lieberman's Motion to Dismiss [Docket No. 264] is **GRANTED**.

32.  The Government's Motion for Discovery as to Darrel Griepp [Docket No. 185] is **GRANTED**.

42.  The Government's Motion to Compel Handwriting Exemplars as to Griepp [Docket No. 206] is **GRANTED**.

32.  Griepp's Motion for Disclosure of Post Conspiracy Statements of Codefendants [Docket Nos. 227, 233] is **GRANTED** as follows: the Government shall reveal such statements thirty days before trial.

33.  Griepp's Motion for Discovery and Inspection [Docket No. 229] is **GRANTED** to the extent required by Federal Rule of Criminal Procedure 16.

34.  Griepp's Motion for Discovery of Expert [Docket No. 230] is **GRANTED** as follows: reciprocal expert disclosures are due from both Defendant and the Government thirty days before trial.

35.  Griepp's Motion to Suppress Statements [Docket No. 232] is **WITHDRAWN**.

36.  Griepp's Motion for Early Disclosure of Jencks Act Material [Docket No. 234] is **GRANTED** follows: disclosure is due ten days before trial.

37.  Griepp's Motion for Disclosure of 404(b) Evidence [Docket No. 235] is **GRANTED** as follows: Rule 404(b) materials are to be disclosed ten days before trial; however, the Government is not required to provide a Rule 404(b) witness list.

38.  Griepp's Motion to Produce Grand Jury Testimony of any Witness

Who Will Testify at Suppression Hearing [Docket No. 236] is **DENIED AS MOOT**.

39.     Griepp's Motion for Bill of Particulars [Docket No. 240] is **DENIED**.

40.     Griepp's Motion to File Supplemental Pretrial Motions [Docket No. 241] is **DENIED AS MOOT**.

Dated:   August 2, 2006                          s / Michael J. Davis_____
                                                 Judge Michael J. Davis
                                                 United States District Court